# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EDUCATIONAL ASSISTANCE FOUNDATION FOR THE DESCENDANTS OF HUNGARIAN IMMIGRANTS IN THE PERFORMING ARTS, INC., | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 11-1573 (RBW)

## MEMORANDUM OPINION

The plaintiff, Educational Assistance Foundation for the Descendants of Hungarian Immigrants in the Performing Arts, Inc. ("Foundation"), challenges the Internal Revenue Service's ("IRS") decision to revoke its status as a tax-exempt organization under 26 U.S.C. § 501(c)(3). Amended Complaint for Declaratory Judgment ("Am. Compl.") ¶¶ 1, 12, 27–31. The IRS has moved for summary judgment, asserting that "there is no genuine issue as to any material fact," and that "[t]he administrative record . . . amply supports the actions taken by the [IRS] to revoke [the] [Foundation]'s tax-exempt status." United States' Motion for Summary Judgment ("Def.'s Mot."), at 1. Upon careful consideration of the parties' submissions[1] and the

---

[1] The Foundation asks the Court to seal its opposition to the IRS's motion for summary judgment. Plaintiff's Motion to Seal [] at 1. While "the decision as to access [to judicial records] is one best left to the sound discretion of the trial court," United States v. Hubbard, 650 F.2d 293, 316–17 (D.C. Cir. 1980) (citation omitted), there nevertheless is a "strong presumption in favor of public access to judicial proceedings," EEOC v. Nat'l Children's Ctr. Inc., 98 F.3d 1406, 1409 (D.C. Cir. 1996). In this Circuit, "[s]ix factors are generally considered when determining whether a movant has shown sufficiently compelling circumstances to overcome the presumption in favor of public access," Kline v. Williams, No. 05-01102, 2012 WL 1431377, at *1 (D.D.C. Apr. 25, 2012) (citing Hubbard, 650 F. 2d at 317–20), but the Foundation has failed to address any of these factors in its motion to seal. Indeed, the only stated basis for the Foundation's motion to seal is the defunct suggestion that some of the

(continued . . . )

Administrative Record ("A.R."), the Court concludes for the reasons that follow that it must grant the IRS's motion.[2]

# I. BACKGROUND

Julius Schaller died in December 2003, Def.'s Facts ¶ 1; Pl.'s Facts ¶ 1, leaving a Last Will & Testament that appointed Barrett Weinberger and Frances Odza as joint executors of his estate, A.R. at 165.  Following Schaller's death, Weinberger incorporated plaintiff Educational Assistance Foundation for the Descendants of Hungarian Immigrants in the Performing Arts, Inc., for the purpose of "provid[ing] financial assistance to college students" who descend from "an immigrant from the Hungarian area of Eastern Europe" and are "involved in the performing arts." A.R. at 32.  Weinberger listed himself, Odza, and Solomon Zieger as the Foundation's three corporate directors.  A.R. at 48, 57.  All three are descendants of Julius Schaller.  A.R. at 123–24 (estate tax filing noting the familial relationship of each beneficiary to the decedent).

In June 2004, the Foundation "applied to the [IRS] for tax-exempt status," Def.'s Facts ¶ 3; Pl.'s Facts ¶ 3, and following its review, the IRS determined that the Foundation qualified as an exempt organization under section 501(c)(3) of the Internal Revenue Code, A.R. at 98.  After

---

( . . . continued)
information contained in the opposition is covered by the attorney-client privilege—a suggestion that this Court previously rejected outright in its March 27, 2014 Memorandum Opinion and Order.  See Educ. Assistance Found. for the Descendants of Hungarian Immigrants in the Performing Arts, Inc. v. United States, 32 F. Supp. 3d 35, 48 (D.D.C. 2014) ("any attorney-client privilege that would otherwise protect the Weinberger-Bolden Letter has been waived through the document's inadvertent disclosure and the failure of the alleged privilege holders to take appropriate steps to promptly assert the privilege and aggressively seek to recover the letter").  Therefore, the Foundation offers no active basis for the Court to conclude that it would be appropriate for the opposition to be included as part of the record, but under seal.

[2] In addition to the documents already referenced, the Court considered the following submissions: (1) the United States' Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Def.'s Facts"); (2) the United States' Memorandum in Support of Summary Judgment ("Def.'s Mem."); (3) the Plaintiff's Response to the United States' Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Pl.'s Facts"); (4) the Plaintiff's Memorandum in Opposition to the Government's Motion for Summary Judgment ("Pl.'s Mem."); (5) the United States' Reply Memorandum in Support of Summary Judgment ("Def.'s Reply"); (6) the Plaintiff's Motion for Stay Pending Appeal ("Pl.'s Mot. to Stay"); (7) the United States' Opposition to Plaintiff's Motion for Stay Pending Appeal ("Def.'s Opp'n to Stay"); and (8) the Plaintiff's Reply Brief in Further Support of Its Motion for Stay Pending Appeal ("Pl.'s Reply to Stay").

the IRS granted the Foundation tax-exempt status, the Schaller estate transferred $2,595,847 to the Foundation, and claimed a corresponding federal tax deduction that reduced Schaller's "[n]et estate tax[es]" and "[g]eneration-skipping transfer taxes" to zero.  A.R. at 121, 171.  Weinberger executed the "Gift Agreement" on behalf of both the Schaller Estate as its Executor and the Foundation as its President.  A.R. at 188–91.  This sole transfer from the Schaller estate constituted the Foundation's only donation and source of funding.  Def.'s Facts ¶ 9; Pl.'s Facts ¶ 9.

In December 2004, the Foundation awarded financial scholarships to Michael Chase Weinberger and Adam Zieger for the 2005 calendar year, A.R. at 186, in amounts totaling approximately $146,325, A.R. at 609.[3]  The following year, the Foundation again awarded scholarships to Michael Chase Weinberger and Adam Zieger, as well as Avraham Cashman Wachs, A.R. at 194, in amounts totaling $84,162, A.R. at 610.  Each of the scholarship recipients is a direct descendant of Julius Schaller.  Def.'s Facts ¶ 16; Pl.'s Facts ¶ 16.

The IRS conducted an audit of the Foundation's activities, and based upon its findings, concluded that the Foundation "does not qualify for exemption . . . because it is organized and operated exclusively for the benefit of Julius Schaller's Will."  A.R. at 617.  Furthermore, the IRS determined that its revocation would apply retroactive to the date of the Foundation's inception "because it omitted and misstated material facts in its application for exemption."  Id. The Foundation now brings this declaratory judgment action pursuant to 26 U.S.C. §7428, challenging the IRS's determinations regarding its tax-exempt status.  Am. Compl. ¶ 1.

---

[3] The actual amount of scholarship grants issued during 2005 remains unclear because "[f]unds from the [Schaller] Will and funds from the Foundation were co-mingled" in one account.  A.R. at 608.  The Court recognizes this discrepancy, but notes that it is not material to the resolution of the pending motion for summary judgment.

## II. STANDARD OF REVIEW

"An action for declaratory judgment under 26 U.S.C. § 7428 confers concurrent jurisdiction to the Court for Federal Claims, the United States Tax Court and the District Court to review a final determination by the Secretary of Treasury regarding the tax exempt status of an organization under § 501(c)(3)." Fund for the Study of Econ. Growth and Tax Reform v. IRS, 997 F.Supp. 15, 18 (D.D.C. 1998), aff'd, 161 F.3d 755 (D.C. Cir. 1998). "The standard of review in such cases is de novo and the scope of review is limited to the administrative record in the absence of a showing of good cause." Airlie Found. v. IRS, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citation omitted). "The Court, however, may make findings of fact which differ from the administrative record." Id. at 62 (citation omitted). And "while the court must review the IRS' determination de novo, the organization still carries the burden of demonstrating that it has met the requirement of the statute under which it claims tax exemption." Id. (citing Church of the Visible Intelligence that Governs the Universe v. United States, 4 Cl. Ct. 55, 60 (1983)); see also New Dynamics Found. v. United States, 70 Fed. Cl. 782, 799 (2006) ("The burden is on the applicant to establish that it meets [the] statutory requirements" for tax-exempt status). Thus, the taxpayer "must show both that it is entitled to the tax-exempt status and that the IRS' determination was incorrect." Airlie, 283 F. Supp. 2d at 62 (citing Airlie Found., Inc. v. United States, 826 F.Supp. 537, 547 (D.D.C. 1993)). And in actions based upon 26 U.S.C. § 7428, "the [C]ourt shall grant summary judgment only if one of the moving parties," id., shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. ANALYSIS

**A.  The Foundation's Tax-Exempt Status**

"Exemptions from income tax are matters of legislative grace which the courts have consistently construed strictly."  New Dynamics, 70 Fed. Cl. at 799 (2006) (citing Trs. of the Graceland Cemetery Improvement Fund v. United States, 515 F.2d 763, 770 (Ct. Cl. 1975)). Pursuant to Sections 501(a) and (c)(3) of the Internal Revenue Code, an organization is exempt from federal income taxation if it meets three requirements: "(1) it is organized and operated exclusively for an exempt purpose; (2) its net earnings do not inure to the benefit of any private shareholder or individual; and (3) its activities do not . . . attempt[] to influence legislation." Family Trust of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 155 (D.D.C. 2012) (quoting Visible Intelligence, 4 Cl. Ct. at 61), aff'd 722 F.3d 355 (D.C. Cir. 2013).  "Because the requirements are stated in the conjunctive they all must be met."  Easter House v. United States, 12 Cl. Ct. 476, 483 (1987), aff'd, 846 F.2d 78 (Fed. Cir. 1988).[4]

The IRS revoked the Foundation's tax-exempt status because it "d[id] not operate exclusively for an exempt purpose," and instead "served 'private interests to a more than insubstantial degree'" because scholarships "were made only to descendants of the nieces and nephews of Julius Schaller."  Def.'s Mem. at 16 (quoting A.R. 1023).  "To be operated exclusively for exempt purposes, an organization must engage primarily in activities which accomplish at least one exempt purpose," Visible Intelligence, 4 Cl. Ct. at 61 (citing 26 C.F.R. § 1.501(c)(3)-1(b)(1)(i)), with potential purposes including the following: religious, charitable, scientific, testing for public safety, literary, educational, or prevention of cruelty to children or

---

[4] While not applicable in this case, the Court also notes that "[a]n organization that otherwise meets the statutory requirements will nevertheless fail to qualify for tax-exempt status if its exemption-related activities violate public policy."  Airlie, 283 F. Supp. 2d at 62 n.3 (citing Bob Jones Univ. v. United States, 461 U.S. 574 (1982)).

animals, 26 C.F.R. § 1.501(c)(3)-1(d)(1)(i).  While "an 'incidental non-exempt purpose will not disqualify an organization, . . . a single substantial non-exempt purpose or activity will destroy the exemption, regardless of the number or quality of exempt purposes.'" <u>Fund for Study</u>, 997 F. Supp. 15, 19 (D.D.C. 1998) (quoting <u>Airlie</u>, 826 F.Supp. at 548); <u>see also</u> <u>New Dynamics</u>, 70 Fed. Cl. at 799 ("'Exclusively' in this statutory context is a term of art and does not mean 'solely,'" but if "the organization's activities involve substantially non-exempt purposes, no tax exemption applies." (citations omitted)).

Treasury Regulations further specify that "[a]n organization is not organized or operated exclusively for one or more [exempt] purposes . . . unless it serves a public rather than a private interest."  26 C.F.R. § 1.501(c)(3)-1(d)(1)(ii).  In other words, "it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests." <u>Id.</u>; <u>see also</u> <u>Airlie</u>, 826 F. Supp. at 549 ("[N]o part of an organization's net earnings may inure to the benefit of any private shareholder or individual." (citation omitted)).  "The plaintiff bears the burden of proof to demonstrate that insiders do not benefit from the tax-exempt organization, 'especially where the facts indicate transactions arguably not on arm's length terms.'" <u>Id.</u> at 550 (citation omitted).

The Treasury Regulations offer several hypothetical examples to illustrate this concept, one which is particularly apt to the factual circumstances here:

> (i) O is an educational organization the purpose of which is to study history and immigration. O's educational activities include sponsoring lectures and publishing a journal.  The focus of O's historical studies is the genealogy of one family, tracing the descent of its present members.  O actively solicits for membership only individuals who are members of that one family.  O's research is directed toward publishing a history of that family that will document the pedigrees of family members. A major objective of O's research is to identify and locate living

descendants of that family to enable those descendants to become acquainted with each other.

(ii) O's educational activities primarily serve the private interests of members of a single family rather than a public interest. Therefore, O is operated for the benefit of private interests in violation of the restriction on private benefit . . . .  Based on these facts and circumstances, O is not operated exclusively for exempt purposes and, therefore, is not described in section 501(c)(3).

26 C.F.R. § 1.501(c)(3)-1(d)(1)(iii).  Applying this rationale, the United States Tax Court held in

Parshall Christian Order v. Commissioner that an organization with the sole purpose of providing

"housing, food, transportation, clothing, education & other proper needs as may from time to

time arise" to members of the organization failed meet the requirements of tax-exempt status

because "the only members of petitioner were the [petitioner's principal officer, his wife,] and

their children." 45 T.C.M. (CCH) 488 (1983).  The Tax Court concluded that the organization

"was thus serving the private interests of its creator and his family." Id.

The record here similarly demonstrates that the Foundation was operated in a manner that

inured to the benefit of a single family.  As the Foundation concedes, every educational

scholarship it issued during its existence was to a descendant of Julius Schaller, Pl.'s Facts ¶ 11.

Thus, the private benefit that inured to this one family precludes the Foundation from qualifying

for tax-exempt status.  26 C.F.R. § 1.501(c)(3)-1(d)(1)(ii); see also, e.g., Parshall Christian

Order, 45 T.C.M. (CCH) 488 (1983).  This conclusion is supported by the fact that all charitable

contributions to the Foundation originated from one source—the Schaller estate, A.R. 599, and

the executors of the Schaller Estate—all relatives of Julius Schaller —maintained control over

the Foundation's operations as the members of its Board of Directors, id. at 601.  While a

"family's control over [an organization] is not in itself fatal to [the organization's] cause" when

challenging a revocation or denial of tax-exempt status, Wendy L. Parker Rehab. Found., Inc. v.

C.I.R., 52 T.C.M. (CCH) 51 (1986), "[p]rohibited inurement is strongly suggested where an

individual or small group is the principal contributor to an organization and the principal

recipient of the distributions of the organization, and that individual or small group has exclusive

control over the management of the organization's funds," Johnston v. C.I.R., 56 T.C.M. (CCH)

520 (1988).

      The Court's conclusion is consistent with the Eastern District of South Carolina's

findings under analogous circumstances in Charleston Chair Co. v. United States, 203 F. Supp.

126 (E.D.S.C. 1962).  In Charleston Chair, a private company founded and funded an

organization that would provide educational scholarships exclusively to the company's

employees and their children.  Id. at 127.  That Court concluded that "the narrow class of persons

who might benefit, the more restricted group that did benefit[,] and the preference given to the

son of the director, stockholder and trustee disclose that the Foundation was not operated

exclusively for charitable purposes."  Id. at 128.

      In opposing the IRS's motion for summary judgment, the Foundation contends that it

"was expressly organized to potentially benefit all Hungarian immigrant descendants," Pl.'s

Opp'n at 20, and that "[t]here is simply no basis to apply the private benefit doctrine here"

because "the four scholarship recipients met the criteria to receive scholarship awards from the

Foundation," id. at 23.  This logic is patently flawed.  "[A]n organization must be both

'organized and operated exclusively' for one or more exempt purposes," and "[i]f an

organization fails to meet either prong, it cannot be exempt under section 503(c)(1)."  New

Dynamics, 70 Fed. Cl. at 799.  Even if the Court concludes that the Foundation's "stated purpose

— to provide financial aid to those who are descendants of Hungarian immigrants in the

performing arts . . . — is a charitable purpose," Pl.'s Opp'n at 11, the Foundation must also

operate in a manner that does not inure to the benefit of only one individual or family.  As the

United States Tax Court explained in <u>Wendy L. Parker</u>, prohibited inurement may still occur even if a charitable beneficiary is a member of a larger class that would otherwise qualify the organization for tax-exempt status.  52 T.C.M. (CCH) 51 (T.C. 1986).  In that case, the organization was formed for several purposes, including "aid[ing] the victims of coma[s] . . . with funds[,] therapeutic equipment[,] and devices used in conjunction with accepted coma recovery programs."  <u>Id.</u>  During the 501(c)(3) application process, it was revealed that Wendy Parker, "one of an unspecified number of recovering coma patients," would receive thirty percent of the organization's proceeds.  <u>Id.</u>  Ms. Parker was the daughter of the organization's President and Secretary-Treasurer, and the sister of the organization's Vice President.  <u>Id.</u>  Even though she was a coma patient as contemplated by the organization's proposed tax-exempt purpose, the organization's "selection of Wendy Parker as a substantial beneficiary of its disbursements" demonstrated private inurement.  <u>Id.</u>  The Court therefore not only agreed with the government that the organization's proposed disbursements would improperly benefit Ms. Parker, but would also improperly benefit "the Parker family in providing her care" because it "relieves the Parker family of the economic burden of providing such care."  <u>Id.</u>

Finally, the Foundation suggests that it "should have been allotted five years to operate and develop before being subjected" to an audit by the IRS.  Pl.'s Opp'n at 18.  In an attempt to cast blame on the IRS, the Foundation contends that an audit after only two years of tax-exempt status was premature and did not afford it "an appropriate amount of time to begin operations."  <u>Id.</u>  In support of this proposition, the Foundation relies upon Treasury Regulation § 1.170A-9(f)(4), which reads:

> An organization "normally" receives the requisite amount of public support and meets the 33 ⅓ percent support test for a taxable year and the taxable year immediately succeeding that year, if, for the taxable year being tested and the four

taxable years immediately preceding that taxable year, the organization meets the
33 ⅓ percent support test on an aggregate basis.

26 C.F.R. § 1.170A-9(f)(4).  But this regulation has no bearing on the matter at hand, as it

pertains to the classification of tax-exempt organizations as a public charity, as opposed to a

private foundation.  See id.  "An organization recognized as exempt under § 501(c)(3) is deemed

to be a private foundation unless it qualifies as a public charity through certain exceptions set

forth in I.R.C. § 509(a)."  Fund for Anonymous Gifts v. I.R.S., No. CIV.95-1629, 2001 WL

1203331, at *2 (D.D.C. Sept. 25, 2001); see also 26 U.S.C. § 509 (2012).  While both types of

organizations qualify for tax-exempt status, "private foundations are more closely regulated in

order to prevent misuse of donor funds and to 'compensate for their lack of public

accountability.'"  Fund for Anonymous Gifts, 2001 WL 1203331, at *3 (quoting St. John's

Orphanage v. United States, 16 Cl. Ct. 299, 302 (1989)).  The Foundation has failed to offer any

authority, whatsoever, suggesting that the five-year period used when determining whether a §

501(c)(3) organization qualifies as a public charity has any bearing on the timing of a revocation

audit by the IRS.  To the contrary, the United States Tax Court has opined that, as least with

respect to initial reviews of an organization's tax-exempt status, the government is "not required

to adopt a 'wait and see' approach," and determinations "may be based on projected as well as

actual operations."  Wendy L. Parker, 52 T.C.M. (CCH) 51 (1986).  To reject the Tax Court's

position would permit organizations to operate in contravention of the requirements for tax-

exempt status for up to five years with impunity from government intervention, regardless of the

egregiousness of an organization's violation.

   In sum, the Foundation's arguments that it was organized for tax-exempt purposes does

not redress its failure to operate exclusively for tax-exempt purposes.  The Foundation's decision

to award its scholarships exclusively to members of one family is an improper inurement that

precludes the Foundation from having tax-exempt status, see Parshall Christian Order, 45 T.C.M. (CCH) 488 (1983), and the Court concludes that the IRS properly revoked the Foundation's tax-exempt status.

## B. Retroactive Revocation

The IRS also contends in its summary judgment motion that it properly revoked the Foundation's tax-exempt status retroactive to the date of the Foundation's creation.  Def.'s Mem. at 22.  A "revocation or modification may be retroactive if the organization omitted or misstated a material fact, operated in a manner materially different from that originally represented, or engaged in a prohibited transaction" with "the purpose of diverting corpus or income from its exempt purpose."  26 C.F.R. § 601.201(n)(6)(i), (vii).  "The Supreme Court has held that the IRS Commissioner has broad discretion . . . to decide whether to revoke a ruling retroactively and that such a determination is reviewable by the courts only for abuse of that discretion." Democratic Leadership Council, Inc. v. United States, 542 F. Supp. 2d 63, 70 (D.D.C. 2008) (citing Auto. Club of Mich. v. Comm'r, 353 U.S. 180, 184 (1957)); see also Partners In Charity, Inc. v. C.I.R., 141 T.C. 151, 163 (2013) ("A retroactive revocation of a tax-exemption ruling will not be disturbed in the absence of an abuse of discretion, and we therefore review that retroactive determination for abuse of discretion." (citation omitted)).  For the following two reasons, the Court concludes that the IRS did not abuse its discretion by revoking the Foundation's tax-exempt status retroactively.

First, it is apparent that the Foundation was operated in a manner materially different from that originally represented.  As another former member of this Court explained, where an organization's "earnings were inuring to private individuals, including its leaders," it is the case that "[c]learly, these facts as subsequently developed differ materially from the facts on which

11

the original ruling was based." <u>Freedom Church of Revelation v. United States</u>, 588 F. Supp.

693, 699 –700 (D.D.C. 1984).  Because the Court has determined that the Foundation was

operated in a manner such that the benefits of its scholarships inured to members of only one

family, and this differed materially from its representations set forth in its tax-exempt

application, "the Court must sustain the retroactive application of the revocation of

[Foundation]'s tax-exempt status."  <u>Id.</u> at 700.

      Second, the Administrative Record demonstrates a number of material misstatements that

provide independent bases for sustaining the IRS's decision to revoke the Foundation's tax-

exempt status retroactively.  For example, the Foundation represented in its initial application

that:

> In the spring season of each year, the [Foundation] shall announce the availability
> of financial assistance to eligible recipients.  This announcement shall minimally
> be made in at least two newspapers of general circulation.  The [Foundation] may
> advertise the assistance through any other mass media vehicle it determines to be
> appropriate, including but not limited to the world wide Internet.

A.R. 41-42.  During the application process, the Foundation similarly represented that it would

"advertise the scholarship program in two newspapers of regular circulation such as USA Today

and The Forward (a long standing national newspaper whose readership includes many

Hungarian immigrants) [and would] list the scholarship program with such Internet scholarship

search engines as FastWeb and other financial aid resources."  A.R. at 73.  Actually, however,

the Foundation failed to conduct any advertising campaign consistent with these representations.

It did not advertise in any national news publication, <u>see</u> Pl.'s Facts ¶ 18, and while it contacted

internet search engines Scholarships.com and Fastweb.com to publicize its scholarship

opportunities, it only did so on June 6, 2007—one day after the IRS commenced its audit of the

Foundation's activities and nearly three years after qualifying for tax-exempt status, A.R. at 403

(audit response from Scholarships.com); id. at 1230 (audit response from Fastweb.com).  The Foundation now belatedly contends that it "sent letters to a number of universities" and "employed its board members to publicize the scholarship opportunities by word of mouth," Pl.'s Facts ¶ 18, but these efforts fall far short of the representations the Foundation set forth in its application.  And while the Foundation contends that this is not a <u>material</u> misstatement,[5] the Court finds otherwise, in light of the fact that the IRS specifically inquired into the Foundation's advertising plans during its initial assessment process.  <u>See</u> A.R. at 68 ("Where will the organization advertise the awards?  Two newspapers of regular circulation were mentioned.  What newspapers will be used and how were these selected?").  And where, as here, "[t]he facts upon which the revocation is based are materially different from the representations made in [the Foundation]'s original application for exemption upon which an exemption was granted," retroactive revocation is appropriate.  <u>Freedom Church of Revelation</u>, 588 F. Supp. at 699.

Moreover, the Foundation also misrepresented the manner by which it would select scholarship recipients.  During the application process, the Foundation represented that "[a]n independent scholarship committee comprised of at least three individuals active in, or retired from, institutions of higher learning, shall review all applications, financial need data, academic achievement, and any other matters applicants which [sic] to present in support of their need and deserving of the subject scholarships."  A.R. at 82.  The Foundation further represented that this committee would consist of "Dr. Saul Wachs, former Dean of the College of Education, Gratz

---

[5] The Foundation cites <u>Democratic Leadership Council</u>, 542 F. Supp. 2d 63, for the proposition that "[a]n alleged failure to later advertise in two print newspapers is not a <u>material</u> misstatement."  Pl.'s Opp'n at 26.  The Foundation's reliance on this case is entirely misplaced, however, because the Court in that case concluded that the organization's activities were largely consistent with the representations set forth in its application for tax-exempt status, and noted that the IRS agent responsible for auditing the plaintiff acknowledged that this was the case.  <u>See</u> <u>Democratic Leadership</u>, 542 F. Supp. 2d. at 74–76 ("As the Government's agent acknowledged, and the undisputed facts reveal, the [plaintiff] has not omitted or misstated a material fact or operated in a manner materially different from that originally represented.").  Here, the Foundation's activities differ substantially from its prior representations submitted in support of its application for tax-exempt status.

College, Philadelphia, Pennsylvania, Dr. Neal Raisman, the former president of University of

Cincinnati-Raymond Walters Campus, Blue Ash, Ohio, and Dr. Cyndi Schulman, member,

South Florida Admissions Committee, Brandeis University."  A.R. at 96.  Yet according to

Board Meeting minutes, dated December 27, 2004, and December 27, 2005, the selection

process in actuality consisted of input from Frances Odza and Barrett Weinberger, the only two

in attendance at the meetings, making motions on behalf of the Foundation to "look favorably

upon the grant requests" for each of the Schaller scholarship recipients.  A.R. at 186, 194.  The

minutes show that a scholarship committee had not yet been formed prior to these selections, and

that the applications were reviewed only by Cynthia Schulman "for integrity to eligibility and

expenses."  Id. ("Pending the completion of a scholarship committee, and given the familial

relationship involved, Cynthia Schulman reviewed the applications . . . ." (emphasis added)).

And Cynthia Schulman is a beneficiary of the Schaller Estate and is also named as successor

executor and trustee of the Estate.  A.R. 158, 165.  Yet again, the Foundation contends that these

misrepresentations are "immaterial," but the Court finds otherwise, noting that the IRS

specifically inquired about the composition of the scholarship committee during the application

process.  See A.R. 94–95.

In sum, the Court concludes that there is ample evidence in the Administrative Record

that supports the IRS's conclusion that the Foundation operated in a manner materially different

from what it originally represented, and submitted an application for tax-exempt status that

contained material misrepresentations of fact.  Thus, the IRS's decision comports with the

requirements for retroactive revocation set forth in 26 C.F.R. § 601.201(n)(6)(i), and therefore,

the Court must conclude that the IRS did not abuse its discretion when it retroactively revoked

the Foundation's tax-exempt status.  See, e.g., Prince Edward Sch. Found. v. Comm'r, 478

F.Supp. 107, 113 (D.D.C. 1979) (finding retroactive revocation of tax-exempt status appropriate because such revocation was "consistent with" Treasury Regulation 601.201(n)(6)(i)).

## C.  Stay of Proceedings

Finally, to avoid the inevitable, the Foundation has moved to stay the resolution of the IRS's motion for summary judgment "because an appeal is pending" before this Circuit "that could impact this Court's decision." Pl.'s Mot. for Stay at 1.  The genesis of the appeal traces back to a letter from the co-executor of the Schaller estate to an attorney, which has been the subject of much controversy in this case that need not be repeated in its entirety again here.  See generally Educ. Assistance Found. for the Descendants of Hungarian Immigrants in the Performing Arts, Inc. v. United States, 32 F. Supp. 3d 35 (D.D.C. 2014) (concluding that any attorney-client privilege attached to the letter had been waived); Nov. 21, 2014 Order, ECF No. 73 (denying the Foundation's motion for certification for interlocutory appeal of the Court's privilege ruling).  In concluding that any attorney-client privilege with respect to the letter had been waived, the Court also denied as moot a motion to intervene by the co-executors and beneficiaries of the Schaller estate who wished to argue in favor of the privilege as to the letter being preserved.  Educ. Assistance, 32 F. Supp. 3d at 42.  The Court reasoned that, "regardless of who holds the privilege, the actions taken by any of the parties involved here were insufficient to preserve it."  Id.  The Foundation represents that these individuals have now appealed the Court's decision to deny intervention.  Pl.'s Mot. to Stay at 3.

"On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy."  Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 978 (D.C. Cir. 1985).  To prevail, the movant must "show: (1) a likelihood of prevailing on the merits of its appeal; (2) that it will suffer irreparable injury absent the stay; (3) that the non-moving

party will not be harmed by the issuance of a stay; and (4) that the public interest will be served by a stay."  Al Maqaleh v. Gates, 620 F. Supp. 2d 51, 56 (D.D.C. 2009) (citation omitted). "These factors interrelate on a sliding scale and must be balanced against each other."  Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

Upon review of the parties' filings and the administrative record, the Court concludes that sufficient facts are available to find for the IRS regardless of whether the letter is considered, and in reaching its decision the Court need not rely—and has not relied—on the letter in any manner. Thus, even if the appellants are successful in intervening, and even if they subsequently convinced the Court to reconsider its prior ruling regarding the admissibility of the letter, the resolution of the IRS's summary judgment motion would be the same.[6]  Accordingly, the Foundation has failed to demonstrate how it would suffer any prejudice—let alone irreparable injury—absent the stay.  The remaining three factors do not overcome this deficiency because: (1) the Foundation merely disagrees with the Court's analysis in a conclusory fashion and does not offer a legal basis for the Court to conclude that its decision denying intervention was error; (2) the IRS raises legitimate reasons to conclude that it will be harmed by the stay—namely, that it will delay resolution of its tax claim against the Schaller Estate which "increases the risk that the United States' claim will not be fully paid," Def.'s Opp'n to Stay at 15; and (3) the public interest would be served by the prompt resolution of these matters.  For these reasons, the Court must conclude that the Foundation has failed to satisfy its "obligation to justify the court's exercise of such an extraordinary remedy," Cuomo, 772 F.2d at 978, and therefore must deny the Foundation's motion to stay resolution of the IRS's summary judgment motion.

---

[6] The Foundation's activities contravened the law in such a blatant and egregious manner that the Court could not come to any other conclusion.

## IV. CONCLUSION

The Foundation operated in a manner that inured to the benefit of one family, precluding it from having tax-exempt status.  Therefore, the IRS's decision to revoke the Foundation's tax-exempt status retroactively is supported by the Administrative Record and was not an abuse of its discretion.  Accordingly, the Court must grant the defendant's motion for summary judgment.

**SO ORDERED** this 1st day of July, 2015.[7]


REGGIE B. WALTON
United States District Judge

---

[7] An Order consistent with this Memorandum Opinion will be issued contemporaneously.